IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| GREGG J. BOSS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:16-cv-04065-NKL |
| ) | |
| THE TRAVELERS HOME & ) | |
| MARINE INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

Defendant The Travelers Home & Marine Insurance Company moves to dismiss the Complaint for failure to state a claim. Doc. 19. The motion is denied.

**I.   Background[1]**

Plaintiff Gregg J. Boss was insured under a homeowners' insurance policy issued by Travelers. Due to a storm on June 23, 2014, Boss suffered a partial loss to his home's roof, gutters, and deck. He submitted a claim and Travelers did not dispute coverage.

The policy issued by Travelers to Boss provides for payment of repair or replacement cost, and an initial payment of "actual cash value," for damaged buildings:

> **3.   Loss Settlement.** . . . Covered property losses are settled as follows:
>
> ***
>
> **b.**   <u>Buildings covered under Coverage A or B at replacement cost without deduction for depreciation,</u> subject to the following:

---

[1] The facts are taken from the Complaint, Doc. 1, and documents "contemplated by or expressly mentioned" in the Complaint. *Dittmer Properties, L.P. v. F.D.I.C.*, 708 F.3d 1011, 1021 (8th Cir. 2013). For purposes of ruling on the motion to dismiss, the Plaintiff's allegations are accepted as true, and construed liberally, in the light most favorable to him. *Eckert v. Titan Tire Corp.* 514 F.3d 801, 806 (8th Cir. 2008).

> **(1)** If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of any deductible and without deduction for depreciation, but not more than the least of the following amounts:
>
>> **(a)** The limit of liability under this policy that applies to the building;
>> **(b)** The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or
>> **(c)** The necessary amount actually spent to repair or replace the damaged building.
>
> \*\*\*
>
> **(4)** <u>We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.</u> Once actual repair or replacement is complete, we will settle the loss as noted in **b.(1)** and **b.(2)** above.
>
> However, if the cost to repair or replace the damage is less than $2,500, we will settle the loss as noted in **b.(1)** and **b.(2)** above whether or not actual repair or replacement is complete.

Doc. 20-1, p. 27 (bold in original, underlining added). The policy does not define actual cash value or depreciation, nor does it provide how actual cash value will be calculated.

A Travelers adjuster prepared a written estimate for the cost of repairing Boss's home. According to the estimate and accompanying cover letter, ACV was calculated using the formula "full cost of repair or replacement minus recoverable depreciation." Doc. 32-2, p. 1. The estimate defined depreciation as "the loss in value that occurs over time due to factors such as age, wear and tear and obsolescence." *Id*. Travelers calculated $4,890.20 as the total cost of repair of Boss's property. After deducting $2,189.49 for depreciation and $1000 for the deductible, Travelers made an ACV payment to Boss of $1,700.71. The ACV payment excluded

more than $100 in labor costs because of Travelers' practice of applying depreciation to certain items, such as the cost to repair and replace a roof vent, a vent cover, and a gutter. The estimate reflects Travelers did not depreciate cost items representing only labor, such as the cost to remove, haul, and dispose of shingles.

Travelers does not interpret or calculate ACV by using before and after market value comparison. Travelers uses computer software to make ACV calculations. Boss does not dispute Travelers' use of the "repair or replacement cost less depreciation" formula to calculate ACV through a computer program. Nor does Boss dispute Travelers' practice of depreciating materials in calculating ACV. Boss does dispute Travelers' depreciation of labor costs in calculating ACV, alleging Travelers breached the contract in doing so.

**II.      Discussion**

Travelers concedes that it is essentially asking this Court to reconsider a prior ruling in a nearly identical case, *LaBrier v. State Farm Fire & Cas. Co.,* 2015 WL 7738362 (W.D. Mo. Nov. 30, 2015). Doc. 19, p. 2. Travelers argues that the Court should reach a different conclusion here, because certain issues "were not fully briefed or analyzed" in *LaBrier. Id.* Specifically, Travelers argues Boss's Complaint should be dismissed because an ordinary lay person would understand "actual cash value" means "actual economic value." *Id.*, p. 15. Travelers further argues that longstanding Missouri common law does not define actual cash value the way Boss alleges, but as "the actual economic value / fair market value / true value of the damaged property," *id.*, p. 16, and allows for depreciation in the manner Travelers applied when calculating Boss' ACV payment. Travelers also argues Boss' position is contrary to the basic principle of indemnity in Missouri insurance law, and how properties are valued in Missouri in other contexts such as tax assessment and eminent domain condemnation.

If the Complaint is not dismissed, then Travelers asks the Court to adopt the approach of the Minnesota Supreme Court in *Wilcox v. State Farm Fire & Cas. Co.,* 874 N.W.2d 780 (Minn. 2016), a case decided after the *LaBrier* ruling.  In *Wilcox,* the Minnesota Supreme Court concluded that a finder of fact should decide whether labor may be depreciated.  Travelers also asks that any decision adverse to it be applied prospectively only, as a new legal rule.

The interpretation of an insurance policy is a question of law to be determined by the Court. *Mendota Ins. Co. v. Lawson*, 456 S.W.3d 898, 903 (Mo. Ct. App. 2015).  Missouri courts read insurance contracts "as a whole and determine the intent of the parties, giving effect to that intent by enforcing the contract as written." *Thiemann v. Columbia Pub. Sch. Dist.*, 338 S.W.3d 835, 840 (Mo. Ct. App. 2011).  The language used in the policy will be afforded the meaning that would ordinarily be understood by the lay person who bought and paid for the policy. *Krombach v. Mayflower Ins. Co., Ltd.*, 827 S.W.2d 208, 210-11 (Mo. 1992) (en banc)

Ambiguity exists in a policy when the language is reasonably open to different constructions. *Cowin v. Shelter Mut. Ins. Co.,* 460 S.W. 3d 76, 79 (Mo. Ct. App. 2015); *Grable v. Atlantic Cs. Ins. Co.,* 280 S.W.3d 104, 107 (Mo. Ct. App. 2009).  If an ambiguity exists, the policy language will be construed against the insurance company.  *Gulf Ins. Co. v. Noble Broadcast*, 936 S.W.2d 810, 814 (Mo. 1997) (en banc)*;* 30 MO. PRAC., INSURANCE LAW & PRACTICE § 1:22 (2d ed. 2014) (the most favorable construction to the insured must be adopted).  There are at least two reasons for doing so.  "First, insurance is designed to furnish protection to the insured, not defeat it."  *Krombach*, 827 S.W.2d at 10-11 (citation omitted). "Second, as the drafter of the insurance policy, the insurance company is in the better position to remove ambiguity from the contract." *Id.*

### A. Missouri common law does not define "actual cash value."

The Boss policy uses the term "actual cash value," but does not define it. Travelers argues that Missouri common law equates actual cash value with "actual economic value / true value / fair market value," and in turn that those terms mean the difference in the value of the property before and after the loss.

The Court previously considered the nearly identical issue in *LaBrier*, 2015 WL 7738362. There, the defendant insurance company, relied primarily on *Wells v. Mo. Property Ins. Placement Facility,* 653 S.W.2d 207 (Mo. 1983) (en banc), and *Porter v. Shelter Mut. Ins. Co.,* 242 S.W.3d 385, 390 (Mo. Ct. App. 2008), to argue that the Missouri common law defined ACV as the difference between the before and after fair market value of the insured property. The Missouri Supreme Court in *Wells* held that for purposes of the insurance policy in dispute there, actual cash value meant the before and after fair market value of the insured loss. But in *Wells* the damage to the property was caused by fire and therefore involved an interpretation of Mo. Rev. Stat. § 379.140 and § 379.150, two statutes that deal with damage caused by fire. Neither *Wells* nor any case cited by the parties in *LaBrier* defined actual cash value except when the insured loss resulted from fire, and Mo. Rev. Stat. § 379.140 or § 379.150 were found to be applicable. The Court concluded those cases were not applicable because the insured's loss resulted from hail, not fire. 2015 WL 7738362, at *3.

Furthermore, in *Cincinnati Ins. Co. v. Bluewood,* 560 F.3d 798 (8th Cir. 2009), the Eighth Circuit was squarely presented the question of whether § 379.150's definition of actual cash value controlled when a loss was caused by something other than fire. There the insured suffered a partial loss due to water damage. As requested by the defendant, Cincinnati Insurance Company, the jury was instructed that actual cash value meant "the cost to replace the damaged property

less a deduction that reflects depreciation, age, condition and obsolescence, if any." *Id.* at 802. The plaintiff insured argued on appeal that the policy terms, which defined actual cash value as the replacement cost minus depreciation, should not have been enforced as written because § 379.150 set a different, controlling measure of damages, that is, the difference between the fair market value before and after the loss. The Defendant Cincinnati Insurance Company argued that § 379.150 did not apply unless the casualty was fire. The Eighth Circuit examined § 379.150 and *Wells,* and held that the Missouri Supreme Court would find § 379.150 applies only to losses caused by fire, because that interpretation harmonizes the components of the statute and gives meaning to all words of the text. *Compare Garvin v. Acuity,* 2012 WL 5197223, at 5 (W.D. Mo. Oct. 19, 2012) (claim under insurance policy for damage caused by wind; following the Eighth Circuit's reasoning in *Bluewood*, the district court held the Missouri Supreme Court would find §379.140 applies only to cases involving losses caused by fire).[2]

Because neither § 379.140 nor § 379.150 was applicable in *LaBrier*, and because *Wells* and its progeny relied on those statutes to define actual cash value, this Court concluded in *LaBrier* that Missouri does not have a common law definition of actual cash value applicable to losses. 2015 WL 7738362, at * 4. If such a common law definition existed, there would be no reason to adopt § 379.140 and § 379.150 and limit them to only fire losses. *Id.* In addition, one would expect that

---

[2] The Eighth Circuit in *Bluewood* noted that the parties had identified "four decisions in which the Missouri Court of Appeals mentioned that section 379.150 might extend to losses caused by risks other than fire." 560 F.3d at 804 (citing *Porter v. Shelter Mut. Ins. Co.,* 242 S.W.3d 385, 391 (Mo. Ct. App. 2007); *Herring v. Prudential Prop. & Cas. Ins. Co.,* 96 S.W.3d 893 (Mo. Ct. App. 2002); *Lopez v. Am. Family Mut. Ins. Co.,* 96 S.W.3d 891 (Mo. Ct. App. 2002); and *Cady v. Hartford Fire Ins. Co.,* 554 S.W.2d 499, 503 (Mo. Ct. App. 1977)). But the Eighth Circuit rejected Bluewood's argument that "these snippets of dicta suggest … section 379.150 *does* extend to losses caused by risk other than fire." *Id.* (emphasis in original). "The [Missouri Court of Appeals'] passing references to section 379.150 merely confirm that the statute's reach is an open question. The decisions on which Bluewood relies do not conclusively establish the position of the court of appeals on that issue, much less the position of the Missouri Supreme Court." *Id.*

*Wells*, *Porter*, and *Bluewood* would have at least mentioned there was a common law definition for actual cash value, if such a common law definition existed. *Id.*

Here, arguing case law was overlooked, Travelers cites *Griebel v. Niagara Fire Ins. Co.,* 28 S.W.2d 411 (Mo. Ct. App. 1930), but it better supports Boss' position than Travelers'. *Griebel* was an insurance case involving windstorm damage to a house. The policy provided for payment of "cash value." *Id.* at 411. The trial court gave the plaintiff's jury instruction on damages, which provided that in ascertaining loss, the jury "should determine the reasonable market value of the insured property immediately prior to said windstorm and the reasonable value thereof immediately after said windstorm." *Id. at 412.* The defendant insurance company argued on appeal that the jury should have been instructed using the measure of "repair or replacement less depreciation," which was the theory on which the defendant had tried the case. *Id.* The Missouri appellate court concluded that the defendant was not prejudiced by the instruction given, inasmuch as it was evident the jury applied the defendant's theory by awarding the exact amount the defendant's appraiser testified would be the cost of repair or replacement less depreciation. It did not opine that plaintiff's instruction was the correct one under the common law, nor whether any particular definition should have been used. Had common law been as clear-cut and longstanding as Travelers argues here, the court presumably would have made at least some reference to it, but it neither mentioned nor cited any. Further, as in *Cincinnati v. Bluewood,* the insurance company argued that actual cash value meant repair or replacement minus depreciation, and the jury awarded damages consistent with that definition.

Travelers next cites cases involving a pattern, general damages instruction, Missouri Approved Instruction 4.02. Doc. 20, p. 18 (citing *Pace Props., Inc. v. American Manufacturers Mut. Ins. Co.,* 918 S.W.2d 883, 887 (Mo. Ct. App. 1996), and *Lane v. Cape Mut. Ins. Co.,* 674

- 7 -

S.w.2d 644 (Mo. Ct. App. 1984)). M.A.I. 4.02 provides for damages in the amount of the difference between fair market value of property before and after it was damaged. Neither *Pace* nor *Lane* holds that M.A.I. 4.02 applies in a case concerning breach of a policy term that provides for actual cash value payment. Indeed, M.A.I. 4.02 is titled "Property Only" and there is a separate damage instruction for breach of contract, M.A.I. 4.08. The policy in *Pace* provided payment for "direct physical loss of or damage to Covered Property," 918 S.W.2d at 885-86, and the policy language was not set out at all in *Lane*. Similar damages instructions were at issue in two older, pre-M.A.I. insurance cases that Travelers cites, *Schultz v. Queen Ins. Co.,* 399 S.W2d 230 (Mo. Ct. App. 1965), and *Brown v. Penn. Fire Ins. Co., Philadelphia,* 263 S.W.2d 893 (Mo. Ct. App. 1954). Neither opinion set out the policy language, and both opinions simply addressed instructions relating to "damage." *See Schultz*, 399 S.W.2d at 235, and *Brown*, 263 S.W.2d at 899. Neither held that the instructions must be used when a policy provides for payment of actual cash value.

As Travelers points out, in *Brown,* the Missouri Court of Appeals in 1954 identified what it described as a "long line of cases" establishing "the rule in this state…that the measure of damages to real property is the difference between the market value of the property immediately before and immediately after the damage is sustained." 263 S.W.2d at 899. Again, *Brown* addresses simply "damages," not the meaning of a term in an insurance policy. In recent cases expressly addressing the meaning of actual cash value as used in insurance policies—*Wells* (1983), *Porter* (2012), and *Bluewood* (2008)—neither the Missouri Supreme Court, the Missouri Court of Appeals, nor the Eighth Circuit, respectively, found that Brown was referring to a common law rule for the definition of ACV. One would have expected that one of those courts, whether in *Wells*, *Porter*, or *Bluewood*, would have discussed actual cash value as a term with a common law definition, rather than relying

- 8 -

on the language of § 379.140 and § 379.150, if such a common law definition of actual cash law existed.

Furthermore, *Brown* does not hold that the terms of an insurance contract should be controlled by the line of cases cited. An insurance contract is enforced according to its terms, including those concerning liability and the measure of damages. *Williams v. Farm Bureau Mut. Ins. Co. of Missouri,* 299 S.W.2d 587, 588-89 (Mo. Ct. App. 1957) (citing *Boecker v. Aetna Cas. & Sur. Co.,* 281 S.W.2d 561, 565 (Mo. Ct. App. 1955) ("The parties having entered into a contract fixing the limits of liability, the measure of damages as provided therein is controlling.")). And this case involves Travelers' alleged breach of a particular term of the policy, i.e., the one that provides for payment of actual cash value.

Travelers cites another case, *Warren Davis Properties V, L.L.C. v. United Fire and Cas. Co.,* 4 S.W.3d 167 (Mo. Ct. App. 1999), for the proposition that actual cash value means fair market value in the context of water damage. *Warren* is distinguishable inasmuch as the appellate court's equation of ACV and fair market value was based on the parties' "agree[ment]" that the "case law" had so defined ACV where the term was not defined in the insurance contract. *Id.* at 173 (citing *DeWitt v. Am. Fam. Mut. Ins. Co.,* 667 S.W.2d 700 (Mo. 1984) (en banc), and *Pannell v. Mo. Mut. Ins. Guar. Ass'n,* 595 S.W.2d 339 (Mo. Ct. App. 1980)). That case law concerned fire insurance and § 379.140, *DeWitt*, 667 S.W.2d at 707-08, and a claim for a stolen car, *Pannell,* 595 S.W.2d at 341, not real property. The case *Garvin v. Acuity,* 2012 WL 5197223 (W.D. Mo. Oct. 19, 2012), which Travelers also relies on, simply follows *Warren, DeWitt,* and *Pannell* with respect to the definition of ACV.

Finally, Travelers cites *Hannan v. Auto-Owners Ins. Co.,* 2014 WL 3701031 (E.D. Mo. July 25, 2014), in support of its argument that Missouri common law defines actual cash value as

- 9 -

the before and after market value. *Hannan* involved a homeowner's claim against an insurance company for breach of contract after the homeowner suffered storm damage. In the context of ruling on pretrial motions in limine, the district court examined the policy's provision for payment of actual cash value, a phrase not defined in the policy. The district court identified seemingly contradictory statements about how actual cash value could be defined under Missouri law, and then suggested that evidence of replacement cost would be admissible but may not be sufficient to show the actual cash value of the property at the time of the loss. *Hannan* is not persuasive to the extent it contradicts the Eighth Circuit ruling in *Bluewood*. Moreover, while the district court in *Hannan* suggested that proof of replacement cost might be insufficient to prove actual cash value, it did not so rule. In fact it found that the insurance company had opted to pay replacement value to settle the claim and therefore evidence of replacement cost was admissible to show actual cash value even though the replacement cost payment had no deduction for any depreciation. How the issues were going to fit together was apparently reserved for another day until the details of the case were fleshed out.

Travelers also argues at some length that its definition would generally "harmonize" Missouri law concerning valuation of property damage, citing authorities that do not involve damage to real property, but insurance claims concerning personal property such as furniture, automobiles, and a boat, and damages in the context of a tort suit. Doc. 20, pp. 19-22. Travelers also points to Missouri tax assessment statutes, and cases concerning property valuation for purposes of eminent domain. *Id.*, pp. 23-26, and 31-36.

But Travelers admits that the authorities it cites concerning other types of damage do not invariably use a difference-in-value approach. *Id.*, p. 22 ("Several of these cases also demonstrate that one of the appropriate methods of determining this value is with a replacement-

cost-less-depreciation estimate."). Travelers' discussion of tax assessment and eminent domain authority likewise demonstrates that the difference-in-value approach is not the only appropriate approach. Replacement cost less depreciation is also used in those contexts. *Id.*, pp. 23-24 (citing, *e.g., Quincy Soybean Co. v. Lowe,* 773 S.W.3d 503, 505 (Mo. Ct. App. 1989) (tax assessment case; explaining that the replacement cost less depreciation method of valuation is "widely accepted"); *Land Clearance for Redevelopment Authority v. Holland,* 506 S.W.2d 469, 471 (Mo. Ct. App. 1974) (eminent domain case; explaining that replacement cost less depreciation method was appropriately used to value condemned building); and M.A.I. 9.01 (eminent domain instruction; property could be valued in different ways as provided and s appropriate, including replacement cost less depreciation)).

That Missouri law uses different methods for valuing property in a variety of contexts, and even within the insurance context, reinforces the Court's conclusion that the difference in before and after value is not the exclusive meaning of ACV for purposes of the Boss policy. The foregoing does not demonstrate that Missouri has a fixed common law definition of actual cash value, nor is the Court persuaded to depart from its analysis of the same in *LaBrier.* The Court's conclusion is reinforced by the discussion, in the following section.

### B. Meaning of actual cash value in Boss' policy

After concluding in *LaBrier* that Missouri common law did not supply the definition of actual cash value, the Court then concluded that the term actual cash value was "inherently ambiguous," absent a definition in the policy. 2015 WL 7738362, at *4. The Court reaches the same conclusion here.

Policy language is ambiguous when there is indistinctness or uncertainty in the meaning of words used, or the language is reasonably open to different constructions. *E.g., Krombach*,

827 S.W.2d at 210-11. The meaning afforded the language used in the policy is that which would ordinarily be understood by the lay person who bought and paid for the policy. *Id.* Furthermore, ambiguous language is construed against the insurer. *Gulf Ins.*, 936 S.W.2d at 814.

Several courts in other jurisdictions have concluded that the phrase "actual cash value," as used in similar insurance policies, is ambiguous when left undefined. In *Evanston Ins. Co. v. Cogswell Properties, LLC*, 2009 WL 198745, at *4 (W.D. Mich. Jan. 23, 2009), the district court explained that a "variety of methods are used to determine the value of real property, including market value, replacement cost, replacement cost minus depreciation, and stream of income. The meaning of actual cash value is ambiguous."

In *Adams v. Cameron Mut. Ins.,* 430 S.W.3d 675, 678-79 (Ark. 2013), the Supreme Court of Arkansas also held that "actual cash value" as used in an insurance policy was ambiguous. The parties agreed that some form of depreciation was allowed in computing actual cash value, but the policy did not provide definitions or a calculation methodology. Because the policy was fairly susceptible of more than one interpretation, the court held it was ambiguous. *Id.*[3]

Indeed, as evidenced in *Bluewood* and the cases discussed above, insurance companies do

---

[3] *See also Beard v. Allstate Indem. Co.*, 2011 WL 3330567, at *9 (E.D. Mich. Aug. 3, 2011) ("While it is clear that Plaintiff may recover the actual cash value of the property, the policy…is ambiguous as to how actual cash value is calculated."); *Holden v. Farmers Ins. Co. of Washington,* 239 P.3d 344, 349 (Wa. 2010) (policy in which actual cash value is undefined and does not specify what formula will be used to calculate it is ambiguous); *Mills v. Foremost Ins. Co.,* 511 F.3d 1300, 1304 (11th Cir. 2008) (holding that the cost of overhead, profit, and taxes were included in actual cash value, because they were not unambiguously excluded); *Dickler v. CIGNA Property and Cas. Co.*, 957 F.3d 1088, 1098-99 (3rd Cir. 1992) (where policy did not define actual cash value or depreciation, policy was ambiguous and would be construed in favor of insured to define depreciation as physical deterioration); and Harold H. Reader III, MODERN DAY ACTUAL CASH VALUE: IS IT WHAT THE INSURERS' INTENDED?, 22 Tort & Ins. L. J. 282, 283 (Winter 1987) (acknowledging the "disputes (among both commentators and the courts) as to the meaning of the term actual cash value": fair market value, replacement cost minus depreciation, or as calculated under the so-called broad evidence rule).

not agree on the meaning of actual cash value.

Travelers points to *Berthold v. Clay Fire & Marine Ins. Co.,* 2 Mo. App. 311 (1876), as evidence that an ordinary lay person would understand actual cash value to mean "actual economic value." Doc. 20, p. 16. In that insurance case, the jury was instructed to "assess damages at the amount they believe from the evidence the actual cash value of the damages so sustained on said mill[.]" *Id.* at 314. The court did not define actual cash value, concluding that "an ordinary jury would sufficiently understand what the expression meant, and would not be misled by it." *Id.* at 315. Whatever the perceived understanding of an ordinary jury in 1876 concerning actual cash value, the Court is not convinced the same must be true 140 years later, especially not in view of the more recent opinions. Further, even if a juror understood the term actual cash value to be "actual economic value," the Court is not convinced the average lay person would understand any better what "actual economic value" means. Even M.A.I. 4.02 (which the Court has found to be inapplicable) requires the term "fair market value" to be defined for the jury. *See also Kinder v. Pursley*, 488 S.W.2d 937, 941 (Mo. Ct. App. 1972) (holding that "fair market value" is a "term[] of art that an ordinary juror probably would not understand" and must therefore be defined). "Fair market value" is a much more concrete term than "actual economic loss," or actual cash value, yet a specific definition is required by the MAI.

Because the Boss policy is ambiguous, it must be construed in favor of the insured. Boss's interpretation of actual cash value as repair or replacement cost minus depreciation is one of a variety of reasonable definitions used in the context of partial loss. Therefore, the Court finds actual cash value means replacement cost minus depreciation.[4] *E.g., Grable,* 280 S.W.3d at 107 (insurance policy terms are ambiguous if they are reasonably open to different reasonable

---

[4] There is no dispute that a deductible is also to be subtracted from the actual cash value payment.

constructions).

Furthermore, the parties' course of conduct is consistent with the Court's interpretation. "It is a well-established rule of law that the construction placed upon a contract by the parties as evidenced by acts, conduct, or declarations indicating a mutual intent and understanding will be adopted by the courts where the language of the contract is ambiguous, or there is a reasonable doubt as to its meaning[.]" *State ex rel. Nw. Mut. Life Ins. Co. v. Bland*, 189 S.W.2d 542, 549 (Mo. 1945) (en banc). *See also Aetna Cas. & Sur. Co. v. Haas,* 422 S.W.2d 316, 320 (Mo. 1968) (where an insurance company "placed a practical construction of coverage under the policy by paying a like property damage loss under a prior identical policy[,]" such "construction was against its interest and will be given great weight in ascertaining the intention of the parties to the contract"). Here, a Travelers adjuster prepared a written estimate for the cost of repairing Boss's home. According to the estimate and accompanying cover letter, ACV was calculated using the formula "full cost of repair or replacement minus recoverable depreciation" and that was the basis for Boss' ACV payment after depreciation and deductible. Boss agrees that this is the proper definition of actual cash value and disagrees only with what is properly depreciated. This conduct of the parties is some evidence of what they intended when they formed the contract.

In summary, the Court finds that actual cash value in Boss's policy means replacement cost minus depreciation.

### C. Labor may not be depreciated

Travelers next argues that it was permitted to depreciate labor to calculate ACV. It also argues that permitting Boss to recover undepreciated labor would violate basic principles of indemnity by permitting him to get replacement value for the labor even though he never replaced his damaged property.

In *LaBrier,* the Court examined numerous cases in which different courts had reached different conclusions about the meaning of depreciation and concluded the term was ambiguous. 2015 WL 7738362, at *4 and n. 4.[5]

Recent rulings by other courts provide additional support for this conclusion. In April 2016, the Eastern District of Kentucky denied an insurance company's motion for judgment on the pleadings, holding that the plaintiff had stated a plausible claim for breach of contract. *Brown v. Travelers Cas. Ins. Co. of America,* 2016 WL 1644342, at *5 (E.D. Ky. Apr. 25, 2016). The *Brown* court held that the "ordinary meaning of 'depreciation' allows an insurer to depreciate the value of labor that has merged with a finished good[,]…[but not] the value of pure labor that has not merged with a finished good." *Id.* at *3. But even if that definition of depreciation was not the correct one, "then the definition of 'depreciation' is at least ambiguous." *Id.* at *3, n.3. In February 2016, the

---

[5] *See Evanston Ins. Co. v. Cogswell Properties, LLC*, 2009 WL 198745, at *4 (W.D. Mich. Jan. 23, 2009) (explaining that a "variety of methods are used to determine the value of real property, including market value, replacement cost, replacement cost minus depreciation, and stream of income. The meaning of actual cash value is ambiguous."), and *Adams v. Cameron Mut. Ins.,* 430 S.W.3d 675, 678-79 (Ark. 2013) (holding that "actual cash value" as used in an insurance policy was ambiguous; the parties agreed that some form of depreciation was allowed in computing actual cash value, but the policy did not provide definitions or a calculation methodology, and because the policy was fairly susceptible of more than one interpretation, the court held it was ambiguous. *See also Beard v. Allstate Indem. Co.*, 2011 WL 3330567, at *9 (E.D. Mich. Aug. 3, 2011) ("While it is clear that Plaintiff may recover the actual cash value of the property, the policy…is ambiguous as to how actual cash value is calculated."); *Holden v. Farmers Ins. Co. of Washington,* 239 P.3d 344, 349 (Wa. 2010) (policy in which actual cash value is undefined and does not specify what formula will be used to calculate it is ambiguous); *Mills v. Foremost Ins. Co.,* 511 F.3d 1300, 1304 (11th Cir. 2008) (holding that the cost of overhead, profit, and taxes were included in actual cash value, because they were not unambiguously excluded); *Dickler v. CIGNA Property and Cas. Co*., 957 F.3d 1088, 1098-99 (3rd Cir. 1992) (where policy did not define actual cash value or depreciation, policy was ambiguous and would be construed in favor of insured to define depreciation as physical deterioration); and Harold H. Reader III, MODERN DAY ACTUAL CASH VALUE: IS IT WHAT THE INSURERS' INTENDED?, 22 Tort & Ins. L. J. 282, 283 (Winter 1987) (acknowledging the "disputes (among both commentators and the courts) as to the meaning of the term actual cash value": fair market value, replacement cost minus depreciation, or as calculated under the so-called broad evidence rule).

Minnesota Supreme Court took a different approach, adopting a broad-evidence rule under which the trier of fact decides whether labor can be depreciated for an ACV calculation. *Wilcox v. State Farm Fire & Cas. Co.,* 874 N.W.2d 780 (Minn. 2016). The Minnesota court held that when the insurance policy does not define actual cash value or "otherwise state whether embedded labor costs are depreciable for the purpose of calculating actual cash value, the trier of fact may consider embedded-labor-cost depreciation when such evidence logically tends to establish the actual cash value of a covered loss." *Id.* at 785. But "[e]mbedded-labor-cost depreciation …is only one of many factors to be considered by the trier of fact; and its relevance depends on the facts and circumstances of the particular case." *Id.*

In *LaBrier*, the Court held that "[b]ecause the terms actual cash value and depreciation in this context are ambiguous, the Court [was required to] resolve the dispute in favor of the insured unless LaBrier's interpretation is not reasonable." 2015 WL 7738362, at *7. In Missouri "[a]mbiguities are resolved in favor of the insured because "'insurance is designed to furnish protection to the insured, not defeat it.'" *Id.* (quoting *Krombach*, 827 S.W.2d at 10-11). "'[A]s the drafter of the insurance policy, the insurance company is in the better position to remove ambiguity from the contract.'" *Id.* This rule prevents the insurance company from arguing that the terms of their policy mean one thing in one case and another thing in another case, depending on how the insurance company will benefit.

There are a variety of ways to calculate the actual cash value of a roof and all necessarily rely on approximation. The value of the old shingles, plus the cost of installing them—the method Boss urges—is one approximation. The present-day cost of replacing the roof, minus depreciation for some labor and materials—the method Travelers used in calculating actual cash

Minnesota Supreme Court took a different approach, adopting a broad-evidence rule under which the trier of fact decides whether labor can be depreciated for an ACV calculation. *Wilcox v. State Farm Fire & Cas. Co.,* 874 N.W.2d 780 (Minn. 2016). The Minnesota court held that when the insurance policy does not define actual cash value or "otherwise state whether embedded labor costs are depreciable for the purpose of calculating actual cash value, the trier of fact may consider embedded-labor-cost depreciation when such evidence logically tends to establish the actual cash value of a covered loss." *Id.* at 785. But "[e]mbedded-labor-cost depreciation …is only one of many factors to be considered by the trier of fact; and its relevance depends on the facts and circumstances of the particular case." *Id.*

In *LaBrier*, the Court held that "[b]ecause the terms actual cash value and depreciation in this context are ambiguous, the Court [was required to] resolve the dispute in favor of the insured unless LaBrier's interpretation is not reasonable." 2015 WL 7738362, at *7. In Missouri "[a]mbiguities are resolved in favor of the insured because "'insurance is designed to furnish protection to the insured, not defeat it.'" *Id.* (quoting *Krombach*, 827 S.W.2d at 10-11). "'[A]s the drafter of the insurance policy, the insurance company is in the better position to remove ambiguity from the contract.'" *Id.* This rule prevents the insurance company from arguing that the terms of their policy mean one thing in one case and another thing in another case, depending on how the insurance company will benefit.

There are a variety of ways to calculate the actual cash value of a roof and all necessarily rely on approximation. The value of the old shingles, plus the cost of installing them—the method Boss urges—is one approximation. The present-day cost of replacing the roof, minus depreciation for some labor and materials—the method Travelers used in calculating actual cash

value—is another.  Still another way is fair market value.  Whatever method is used, all are designed to approximate the insured's pre-loss position as the owner of an old roof.

Finally, and of significant importance, Travelers controlled the language of the policy, Boss did not.  Travelers could have clarified these issues so that the same definition of actual cash value would apply each time, regardless of whether the definition favored the insurance company or the insured.  Having failed to do so, the ambiguous language of the policy must be interpreted against the insurance company under Missouri law.[6]

Travelers' motion to dismiss is denied.

### D. Travelers' request for application of the broad evidence rule

Travelers argues that, if this Court does not interpret its insurance policy in the manner it prefers, the Court should permit a finder of fact to determine whether labor should be depreciated, whether a jury or an appraisal panel.

With respect to a jury, Travelers points to the Minnesota Supreme Court's *Wilcox* decision, 874 N.W.2d 780.  There, the Minnesota court held that under the so-called broad evidence rule, "depreciation of embedded labor costs is [not] so illogical that it may never be considered." *Id.* at 785.  The Minnesota court then concluded that a jury, not a judge, should determine whether the depreciation of labor methodology is "logical." *Id*.  A similar approach was taken in *Brown v. Travelers Cas. Ins. Co. of America,* 2016 WL 1644342 (E.D. Ky. Apr. 25, 2016).  The Court declines to adopt a similar approach, first because Missouri has not adopted the broad evidence rule, which is a common law rule, and second because such an approach is

---

[6] The cases Travelers cites in which courts have applied or acknowledged a replacement-cost-less-depreciation methodology simply reference a depreciation percentage.  They do not address depreciation of labor, nor indicate any party even raised the issue.  Doc. 20, p. 24 (and cases cited therein).

likely to result in inconsistent findings on the same contract language and factual evidence, a result not favored in the law.

Travelers cites Missouri eminent domain cases in which the finder of fact was entitled to consider "[a]ny factor that has a present, quantifiable effect on", or "any evidence which sheds light on", the value of property. Doc. 33, p. 12 (citing *State ex rel. Mo. Hwy. & Transp. Comm'n v. Horine,* 776 S.W.2d 6, 12 (Mo. 1989), and *State ex rel. Mo. Hwy. & Transp. Comm'n v. Jasper,* 544 S.W.2d 554, 556 (Mo. 1976)). The procedure in such cases springs from Mo. Const. art. I, § 26, which provides that just compensation in eminent domain cases "shall be ascertained by a jury or board of commissioners…in such manner as may be provided by law[.]" *See also* Mo. Rev. Stat. §523.001 (describing valuation of property in eminent domain proceedings). No Missouri court has held that eminent domain law permits a jury to decide what an insurance policy covers.

Travelers also argues that an insurance appraisal panel could decide the question. If an insurer's and insured's disagreement is over the amount of loss, appraisal may be appropriate. *See, e.g., Lance v. Royal Ins. Co.,* 259 S.W. 535, 535 (Mo. App. 1924) ("A provision in an insurance policy for the amount of the loss to be ascertained by appraisers in case of disagreement in relation thereto is binding and enforceable."). However, Missouri law does not permit a panel to resolve disputes concerning insurance coverage. *See American Family Mut. Ins. Co. v. Dixon,* 450 S.W.3d 831, 836 (Mo. Ct. App. 2014) (citing Mo. Rev. Stat. § 435.350)). *See also D.R. Sherry Const., Ltd., v. Am. Family Mut. Ins. Co.,* 316 S.W.3d 899, 902 (Mo. 2010) ("[T]he interpretation of an insurance contract is generally a question of law, particularly in reference to the question of coverage."). Even where disagreement over the amount of a loss is only "incidental to the actual underlying (legal) controversy between the two parties as to the

meaning of the insurance contract and its application to the facts," it is appropriate to decline to order an appraisal. *Hawkinson Tread Tire Serv. Co. v. Ind. Lumbermens Mut. Ins. Co.,* 245 S.W.2d 24, 28 (Mo. 1951). Here, an appraisal panel is not appropriate, at minimum because any disagreement over the amount of loss is incidental to the legal controversy concerning the meaning of the Boss contract and its application to the facts. Further, Travelers points to nothing in the insurance policy that provides for an appraisal process.

### E. Travelers' alternative request for retroactive application of ruling

Finally, Travelers asks the Court to apply prospectively any adverse ruling. The Missouri Supreme Court applies a three-factor test for determining whether a decision should be given prospective-only effect, and all three factors must be met for a decision to be given such effect. First, the decision in question "must establish a new principle of law ... by overruling clear past precedent." *Trans UCU, Inc. v. Dir. Of Revenue,* 808 S.W.2d 374, 723 (Mo. 1991) (en banc) (citing *Sumners v. Sumners*, 701 S.W.2d 720, 724 (Mo. 1985) (en banc)). This requirement is not satisfied because the Court's ruling overrules no clear past precedent. There was no Missouri precedent finding labor could be depreciated or establishing a common law definition of actual cash value.

The second factor requires a court "to determine whether the purpose and effect of the newly announced rule will be enhanced or retarded by retrospective operation." *Id.* There is no "newly-announced rule" here, but the effect of the decision is to provide rather than defeat coverage, consistent with a standard canon of construction in the context of Missouri insurance law. DAVID D. NOCE, 30 MISSOURI PRACTICE, INSURANCE LAW & PRACTICE §§ 1.20—1.23, 1.31 (2nd ed. 2014). The second factor is also against Travelers.

Under the third factor, a court "must balance the interests of those who may be affected

- 19 -

by the change in the law, weighing the degree to which parties may have relied upon the old rule and the hardship that might result to those parties from the retrospective operation of the new rule against the possible hardship to those parties who would be denied the benefit of the new rule." *Trans UCU,* 808 S.W.2d at 723 (citing *Sumners*, 701 S.W.2d at 724). As noted above, Missouri law provided no clear past precedent to overrule, so Travelers could not have relied on any decision that has now been taken away from it. Nonetheless, Travelers argues that the interests of homeowners who chose not to proceed to repair their property are meager, inasmuch as homeowners should be encouraged to perform repairs and avoid blight. Whatever reason a homeowner had for not proceeding to perform a repair and seek the additional payment, he had the contractual right to not do so. The Court cannot say that enforcing the contractual rights of insureds weighs less than an insurer's interest in avoiding paying its insureds under the contract.

Travelers has not shown that it is entitled to prospective-only application of the ruling on its motion to dismiss.

### III. Conclusion

Defendant The Travelers Home & Marine Insurance Company's motion to dismiss the Complaint for failure to state a claim, Doc. 19, is denied.

<div style="text-align: right;">
s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge
</div>

Dated:  July 25, 2016
Jefferson City, Missouri

- 20 -

Case 2:16-cv-04065-NKL   Document 41   Filed 07/25/16   Page 20 of 20